## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**Safiyo Ali,**                                             **Civil No. 04-1436 (DWF/SRN)**

       **Plaintiff,**

**v.**                                                      **REPORT AND**
                                                            **RECOMMENDATION**

**Jo Anne B. Barnhart,**
**Commissioner of Social Security,**

       **Defendant.**

_____

Charles Krekelberg, Esq., on behalf of Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, on behalf of Defendant

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security (Commissioner) who found Plaintiff not statutorily disabled and not entitled to Disability Insurance Benefits (DIB) under Title II of the Social Security Act.

      The parties have submitted cross-motions for summary judgment.  (Doc. Nos. 8, 11.) The matter is before the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c).

      For the reasons set forth below, it is recommended that the Commissioner's decision be reversed, and the case be remanded to the Commissioner for proceedings consistent with this Report and Recommendation.

I.      **BACKGROUND**

A.      **Factual and Procedural History**

Safiyo Ali (Ali) came to the United States as a refugee from Somalia in September 2001 (R. at 53, 78, 153, 155).  She is about 48 or 49 years old.  (R. at 154.)  Ali has had fourteen children, three of whom have died.[1]  (Id. at 156.)  Ali does not speak, read, or write English; she has no formal education, and she has never worked outside the home.  (R. at 153-56.)  Ali claims that sometime in 1994, while she was living in Somalia, soldiers entered Ali's home and severely beat her.  (R. at 67, 157.)  Because of wartime conditions in Somalia, Ali did not receive medical attention until January 2002, after she came to the United States.  (R. at 67, 69.)

On January 25, 2002, Ali filed an application for supplemental security income with the Social Security Administration, claiming she became unable to work on September 26, 2001, due to constant back pain that limited her ability to sit, stand, or walk.  (R. at 53-57, 67.)  Both Ali's initial application for benefits and her request for reconsideration were denied (R. at 29-30, 38), so she requested a hearing with an administrative law judge (ALJ) (R. at 41).  Ali appeared before Administrative Law Judge Donald Holloway on July 18, 2003.  (R. at 150-177).  On September 15, 2003, ALJ Holloway issued his decision in which he found that Ali was not disabled as defined in the Social Security Act and that she retained the residual functional capacity to perform a wide range of sedentary work in the national economy.  (R. at 22-23.)

---

[1] This information was provided by Ali through an interpreter.  One of Ali's medical records indicates that Ali had fifteen children, four of whom had died.  (R. at 143.)

**B.      Witness Testimony at the Administrative Hearing**

Through the aid of an interpreter, Ali described what happened when the soldiers entered her home:

> [G]unmen come in, stand up and fire.  Three of my children died with fire and they took me into room, start beating me, asking me questions, where I hided my gold, what money I have.  They start beating me.  They even hit back of the gun into my eyes.  As even today I feel the pain or movement in my eyes and my back and legs were severely tortured that I couldn't even stand or move.

(R. at 157.)  Ali stated that, since the beating, she experienced constant pain "all over," particularly in her shoulders, back, and legs.  (R. at 158-59.)  She further complained her eyes and head hurt, and she sometimes felt dizzy and fell down because of her pain and sometimes cried when the pain lasted for two days at a time.  (R. at 159.)  Ali stated she was unable to grab a glass of water or carry anything, could not stand long enough to finish a glass of water, and it was painful for her to sit very long (she testified that she was experiencing discomfort during the administrative hearing).  (R. at 160, 162.)  She testified that she does not drive, does not do any housework, and does not take care of her children.  (R. at 163-64.)  Ali explained that she also had significant pain in her toes and pain and swelling in her knees.  (R. at 161.)  Finally, Ali explained that sometimes the pain went away and she felt better, but such respites lasted no more than two days before her severe pain returned.  (R. at 159.)

Ali testified her daily activities were limited to sleeping and sitting for short periods of time.  (R. at 159-64.)  Ali explained that ever since she was injured she has been unable to take care of her younger children or do housework, so her older children have done it.  (R. 164.)  At the time of the administrative hearing, Ali had been using a walker for about five months.  (R. at 162.)  Ali stated she could not walk "too far" with her walker because it gave her back pain.  (Id.)  She indicated that for longer trips she uses a wheelchair.  (Id.)

Ali's son Fisa Hassan (Hassan) also testified at the hearing.  When questioned by the ALJ, Hassan explained that he did not see Ali lift or carry anything or do any household work, in particular he said she did not pick up clothes, clean the house, clean dishes, or cook food.  (R. at 166-67, 170.)  He stated that Ali did not carry her food or clean herself unassisted by others, never sewed, did not bend or stoop, and did not push or pull things.  (R. at 167-68.)  Hassan testified that Ali could not stand for more than two minutes or walk with her walker more than a city block.  (R. at 170.)  He said that Ali had difficulty getting in and out of a car and her bed and that her children sometimes would help her to sit in the car and move her legs into her bed.  (R. at 171.)  Hassan testified that Ali acted tired like someone who worked all day and slept much of the day.  (R. at 171-72.)  Hassan reported Ali was taking four mediations to make her sleep.  (Id.)

Finally, the ALJ also engaged Hassan in the following exchange:

ALJ:        So you are one of the oldest children in the family?

Hassan:     Yes.

ALJ:        And generally in Somali, Somalia, mothers of big families are expected to be retired in their late 40s, right, and the children support them and the husband takes care of them?

Hassan:     Yes.

ALJ:        That's when they quit work.  It's kind of a Social Security system that really works well, right?  The landlord doesn't expect the woman to work anymore and everyone takes care of her.

Hassan:     Yes.

(R. at 172-73.)

### C.    Medical Evidence

#### 1.  Treating Physicians

On January 16, 2002, Ali was examined by Dr. Julie A. Spina.  (R. at 99.)  Ali

complained of constant pain in her low to mid back that radiated into her neck and knees.  (Id.)

Ali told Dr. Spina that she had never visited a physician for her pain before and that her pain was

constant but the severity of her pain fluctuated.  (Id.)  Dr. Spina observed:

> the patient appears to be in pain with any movement.  She shifts in the chair,
> apparently secondary to pain.  Attempting to walk she uses a cane and has a lot of
> discomfort, more on the right side than the left.  When attempting to get on the
> exam table is awfully painful, as well as trying to lay back.  She has a lot of
> tenderness over the whole back area.

(Id.)  Dr. Spina also referred Ali to have some x-rays taken.  (R. at 115.)  Ali received spine x-

rays on January 17, 2002.  (Id.)  The x-rays showed no fractures, but they did show some

spurring and mild degenerative changes in the spine.  (Id.)  On March 21, 2002, Dr. Spina noted

following an examination of Ali that Ali's "gait is very slow and the movement of walking,

though her gait is well coordinated and smooth, is very hesitant and extremely slow.  She is in

obvious pain with movement."  (R. at 109.)

Dr. Spina referred Ali to Dr. Karim for management of her back pain, shoulder pain, and

shin pain.  (R. 138.)  Dr. Karim examined Ali on April 23, 2002.  (R. at 138-41.)  Ali indicated

she was not getting relief from her pain by taking Celebrex and participating in physical therapy.

(R. 138.)  Dr. Karim administered shoulder and lower-back injections and recommended that Ali

participate in physical therapy and continue taking her medications.  (R. at 140.)  On May 22,

2002, Dr. Karim saw Ali for a follow-up examination.  (R. at 136.)  Dr. Karim noted that Ali

continued to experience "painful range of motion" in her left shoulder and she had tenderness in

her back.  (Id.)  He noted, "This patient has so much pain that she could not lift her leg on the

table." (Id.) Dr. Karim administered more injections and prescribed OxyContin and

Hydrocodone for Ali's pain. (Id.) On June 5, 2002, Dr. Karim examined Ali. (R. at 134.) Ali

reported that her back pain and shoulder were feeling better, but the pain in her knee was still

present and affecting her ability to walk. (Id.) Dr. Karim administered injections to Ali's knees.

(R. at 135.) Dr. Karim assessed Ali's condition as follows:

      1.      L4 radiculopathy bilaterally, left more than right, resolving.

      2.      Shoulder arthropathy, resolving.

      3.      Sacroiliac joint syndrome, resolving.

      4.      Bilateral patellofemoral syndrome.

(R. at 134.) Dr. Karim listed Ali's medications as follows:

      1.      Isoniazid 300 mg q.d.

      2.      Nexium 40 mg q.d.

      3.      Celebrex 200 mg q.d.

      4.      Hydrocodone 5/500 mg 1 to 2 tablets q.4-6h.p.r.n.

      5.      Protonix 40 mg q.d.

      6.      OxyContin 20 mg b.i.d.

(Id.)

On June 24, 2002, Richard C. Bailly, a neurologist, examined Ali at the request of Dr.

Spina. (R. at 143-145.) Dr. Bailly noted that Ali's magnetic resonance imaging scan showed

some degenerative changes. (R. 143.) Dr. Bailly stated that Ali complained of "quite a bit of

pain" when moving her back, but she was "quite loose" and did not have any significant back

spasms. (R. at 144.) Dr. Bailly concluded Ali's symptoms were musculoskeletal in nature and

that there was no evidence of radiating pain in her legs. (Id.) Dr. Bailly recommended that Ali

follow up with a pain center. (R. at 145.)

On July 2, 2002, Dr. Karim saw Ali again and noted that her chronic back pain was improving.  (R. at 130.)  Ali complained again about her knee and ankle.  (Id.)  Dr. Karim administered an injection into Ali's lower back and recommended that Ali continue physical exercise.  (R. at 131.)

On July 24, 2002, Dr. Karim saw Ali for a follow up visit.  (R. at 127.)  Ali stated she was feeling better after receiving injections during her July 2nd visit, but she continued to have severe pain.  (Id.)  Dr. Karim stressed to Ali's son at this visit that Ali needed to lose weight.  (Id.)  Dr. Karim also noted that Ali's right patellofemoral syndrome and lower back pain were "in remission."  (Id.)  Despite Dr. Karim's comment that Ali's back and right knee pain was in remission, however, he still gave Ali more injections, and continued to prescribe her a month's supply of the pain medication hydrocodone (in a dose greater than what Ali had been taking) and the same dose of the pain medication OxyContin.  (R. at 128.)

### 2.  Government Physician

On April 24, 2002, state agency physician Dr. Harvey Aaron conducted a residual functional capacity assessment.  (R. at 118-125.)  Dr. Aaron reviewed Ali's medical records and determined Ali could lift twenty pounds occasionally and ten pounds frequently.  (Id.)  Additionally, Dr. Aaron concluded Ali could stand or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  (R. at 119.)  Finally, Dr. Aaron stated that Ali could frequently balance, occasionally go up ramps and stairs, occasionally stoop, kneel, crouch and crawl, and never climb ladders, ropes, or scaffolds.  (R. at 120.)

### D.   Vocational Evidence

James Berglie (Berglie) appeared at the administrative hearing and testified as the vocational expert.  (R. at 174.)  ALJ Holloway asked the following hypothetical question:

If we hypothetically take a woman 46 to 48 years of age with a, she cannot, she can only communicate orally and that is in Somali, but she is working on learning English but has an inability to effectively communicate in it even orally at this point. If she's limited to lifting [twenty] pounds occasionally and ten pounds frequently, cannot be using ladders, ropes or scaffolds, can only occasionally stoop, kneel, crawl, balance or crouch, and would have to have, should only be on her feet for say two hours out of an eight-hour work shift, and have some ability to alternate sitting and standing throughout an eight-hour shift. If those were the only limitations our hypothetical person had, could she be expected to do competitive work in the national economy?

(R. at 175.) Berglie testified that such a hypothetical individual could perform sedentary to light work at a factory and that hundreds of thousands of jobs exist in Minnesota, North Dakota, and South Dakota which such a person could perform. (R. at 175-76.) Furthermore, Berglie explained the applicable positions were unskilled, the worker would be allowed to sit to perform the work, and she would be given the opportunity to move "a little bit." (Id.) The ALJ also asked what jobs would remain for the hypothetical person to perform if she needed "to take unscheduled breaks in order to complete a seven and a half to eight-hour day." (R. at 176.) Berglie responded that such a hypothetical person would be precluded from all work. (Id.)

## II.   ALJ'S DECISION

The ALJ determined Ali was not disabled after employing the applicable five-step evaluation process prescribed in 20 C.F.R. § 416.920. The ALJ determined under step one of the evaluation that Ali had not engaged in substantial gainful activity. (R. at 21.) Next, under step two, the ALJ found Ali had severe impairments. (Id.) At step three, the ALJ determined that Ali's impairments, though severe, did not meet or equal the clinical criteria of the Listing of Impairments of Appendix 1, Subpart P, Regulation No. 4. (Id.) At step four, the ALJ noted that because Ali had no past relevant work experience, no analysis was needed. (R. at 22.) At step five, the ALJ determined that Ali retained the residual functional capacity for a "wide range of sedentary work activity to a wide range of light work activity." (Id.) The ALJ concluded that

Ali was not disabled because she could perform a significant number of jobs in the national economy.  (Id.)

The ALJ based his decision on the following findings:

1.      The claimant has never engaged in substantial gainful activity.

2.      The claimant has a history of chronic back pain and bilateral knee pain. She has degenerative changes of the lumbar spine (i.e., minimal degenerative spurring of the lumbar spine) and she has left patellofemoral syndrome.  The record supports that these impairments place significant limitations on claimant's ability to perform basic work-related activities and, accordingly, these impairments are "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3.      While severe, claimant's impairments, considered alone or in combination, do not meet or medically equal the clinical criteria described in Listing 1.04 nor do they meet or medically equal the clinical criteria described for any other impairment listed in Appendix 1, Subpart P, Regulation No. 4.

4.      For the reasons outlined in the body of this decision, claimant's testimony regarding the alleged severity of her pain cannot be regarded as entirely credible.

5.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6.      The claimant retains the residual functional capacity for a wide range of sedentary work activity to a wide range of light work activity. Specifically, the claimant can lift and/or carry objects weighing approximately twenty pounds on an occasional basis and she can lift and/or carry objects weighing approximately ten pounds on a[ frequent][2] basis.  Claimant's functional capacity for the full range of light work is compromised by her inability to stand and/or walk for more than two hours in an eight-hour workday.  Claimant is able to stand and/or walk for approximately two hours in an eight-hour workday and she is capable of

_____

[2] The ALJ's findings include a typographical error which if not corrected would find that Ali was restricted to carrying and lifting weights of ten and twenty pounds occasionally with no lesser restriction on how much she could carry or lift frequently.  The Court has corrected the error to be consistent with the ALJ's conclusions concerning Ali's residual functional capacity elsewhere in his opinion (R. at 19) and the hypothetical posed to the vocational expert at the administrative hearing (R. at 175).

engaging in sustained work activity as long as she is provided the opportunity to alternately sit and/or stand for pain relief. Claimant, from a postural standpoint, should avoid climbing ladders, ropes, and scaffolds. She is limited to no more than occasional balancing, stooping, kneeling, crouching, and crawling.

7. The claimant has no past relevant work (20 CFR § 416.965).

8. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 416.963).

9. The claimant is "unable to communicate in English" (20 CFR § 416.964).

10. The claimant has the residual functional capacity to perform a significant range of sedentary to a significant range of light work (20 CFR § 416.967).

11. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rules 201.21 and 202.16 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include unskilled factory jobs, including work as an assembler, a parts cleaner, a parts sorter, and as machine operator. Vocational expert testimony provided at [the] hearing revealed that there are hundreds of these jobs across the greater part of the United States.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

(R. at 21-22.)

## III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A) (2000). The claimant's impairments must be "of such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 423 (d)(1)(A).

### A.    <u>Administrative Review</u>

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. § 405(b)(1), 42 U.S.C. § 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482.  The decision of the Appeals Council (or of the ALJ if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### B.    <u>Judicial Review</u>

The Court's review is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 583 (8th Cir. 2002).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  But "[t]he substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence

supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir.

1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing

analysis."  Id. (quoting Smith v. Heckler, 735 F.2d 312, 315 (8th Cir. 1984)).  In reviewing the

administrative decision, "'[t]he substantiality of evidence must take into account whatever in the

record fairly detracts from its weight.'"  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S.

474, 488 (1951)).

        In reviewing the record for substantial evidence, the Court may not substitute its own

judgment or findings of fact.  Harwood v. Apfel, 186 F.3d 1039, 1042 (8th Cir. 1999).  The

possibility that the court could draw two inconsistent conclusions from the same record does not

prevent a particular finding from being supported by substantial evidence.  Culbertson v. Shalala,

30 F.3d 934, 939 (8th Cir. 1994).  The Court should not reverse the Commissioner's finding

merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25

F.3d 712, 714 (8th Cir. 1994).  In general, the claimant bears the burden of proving his or her

entitlement to disability insurance benefits under the Social Security Act.  20 C.F.R. §§

404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).

        The reviewing court must consider both evidence that supports and evidence that detracts

from the Commissioner's decision.  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

Court is required to review the administrative record and to consider:

1.      The credibility findings made by the ALJ.

2.      The Plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The Plaintiff's subjective complaints relating to exceptional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the Plaintiff's impairments.

6.      The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the Plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

Pursuant to the Social Security Act, the Secretary of Health and Human Services promulgated a five-step analysis to be followed by the ALJ in determining whether a claimant is disabled:

1.      Has the claimant engaged in substantial gainful activity since the alleged onset disability?

2.      Is the claimant suffering from a severe impairment?

3.      Does the claimant's impairment meet or equal the Listing of Impairments set forth by the Social Security Administration in the code of federal regulations.

4.      Does the claimant have the residual functional capacity (RFC) to perform the claimant's past relevant work?

5.      If the claimant is unable to perform past relevant work, is there any other work in the national economy that the claimant can perform?

20 C.F.R. § 416.920(b)-(f); Bowen v. Yuckert, 482 U.S. 137 (1987).

## IV.      DISCUSSION

"If the ALJ finds that the claimant cannot return to his past relevant work, the burden of proof shifts to the [Commissioner], who then has the duty to establish that the claimant is not disabled within the meaning of the Act." Talbott v. Bowen, 821 F.2d 511, 514-15 (8th Cir. 1987). The Commissioner must prove that the claimant retains the ability to do other kinds of work, and other work the claimant can perform exists in substantial numbers in the national economy. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Thus, the burden to show that Ali could still perform work within the national economy was on the Commissioner.

Ali asserts that the ALJ's determination that she is not entitled to disability insurance benefits is not supported by substantial evidence in the record as a whole.  Specifically, Ali contends that the ALJ erred by: (1) not properly considering Ali's age and lack of work experience when he found that Ali possessed the residual functional capacity to perform work; (2) not giving substantial weight to the treating physician's opinion; and (3) failing to credit Ali's subjective complaints of disabling pain and the resulting physical limitations as well as her complaints concerning the side effects of her medications.  (Pl.'s Mem. at 6-7.)

The Social Security Commissioner responds that the ALJ took into account Ali's lack of work experience and inability to communicate in English when assessing her ability to perform work in the national economy.  (Id. at 14.)  Moreover, the Commissioner contends the medical record contains only one functional capacity assessment of Ali and that assessment was performed by the state agency physicians.  (Def.'s Mem. at 11.)  According to the Commissioner, the ALJ acknowledged that Ali was more physically limited than the assessment by the government physicians revealed and the ALJ took the greater restrictions into account in the hypothetical posed to the vocational expert.  (Id.)  Finally, as to Ali's pain complaints, the Commissioner argues that the ALJ partially discounted these complaints due to inconsistencies in Ali's pain allegations and the record as a whole.  (Id. at 11-13.)  The Commissioner asserts that in the absence of objective support for her severe pain complaints and the alleged resulting physical limitations, the ALJ could have properly discounted Ali's testimony because her son testified that Somalian custom was for women of Ali's age with large families to retire and not work.  (Id. at 13.)  Ali's complaints concerning the side effects of her medications was also properly rejected, according to the Commissioner, because the medical record was devoid of such complaints.  (Id. at 12.)

As an initial matter, the Court finds that the ALJ did not commit reversible error when he concluded that work existed in the national economy which Ali could perform despite evidence that Ali could not communicate in English and had no relevant past work experience.  As the Commissioner notes in her brief, the Social Security rules dictate that a person who can perform light work is not otherwise disabled because they are illiterate, unable to communicate, or have no past work experience.  (Id.)  Moreover, the ALJ's hypothetical to the vocational expert did take into account Ali's inability to communicate in English and the vocational expert testified that thousands of regionally located jobs would be available to Ali despite her lack of English skills.  (R. at 175-76.)

Moreover, the Court finds that the ALJ did not commit reversible error when he concluded that Ali could perform work in the national economy despite the opinions in the record of Ali's treating physicians.  None of the treating physicians made specific functional findings concerning Ali's physical abilities.  Further, Ali does not identify what opinion or portion of an opinion by one of her treating physicians might have been overlooked or improperly discounted by the ALJ.  Finally, in formulating his assessment of Ali's physical limitations, the ALJ reviewed the functional capacity assessment provided by the state agency physicians and determined that Ali was somewhat more restricted than that assessment concluded based upon the record as a whole.  (R. at 19.)

The Court, however, does find that the ALJ committed reversible error by failing to make specific findings concerning Ali's subjective complaints.

In order to properly evaluate a claimant's subjective complaints of pain, the ALJ is required to make a credibility determination by taking into account the following factors:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the dosage, effectiveness, and side effects of medication;  (4) precipitating and aggravating factors; and (5) functional

limitations.   Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.

Hutton v. Apfel, 175 F.3d 651, 654-55 (8th Cir. 1999) (citation omitted).  These factors are sometimes referred to as the Polaski factors, after the case in which they were first articulated, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

"The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the record as a whole."   Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  In other words, the ALJ can properly discredit a claimant's subjective complaints, if they are inconsistent with other evidence of record.  But "[i]f an ALJ rejects a claimant's testimony regarding pain, he must make an express credibility determination detailing his reasons for discrediting the testimony." Prince v. Bowen, 894 F.2d 283, 286 (8th Cir. 1990) (emphasis added); see also Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991) ("An ALJ who rejects a claimant's complaints . . . must make an express credibility determination explaining his reasons for discrediting the complaints.").  If an ALJ does not explain why he rejected a claimant's subjective complaints, a reviewing court cannot tell whether his determination was properly made.  Sorich v. Shalala, 838 F. Supp. 1354, 1361 (D. Neb. 1993) ("Without a serious discussion of the Polaski factors in relationship to whatever inconsistencies the ALJ may find, a reviewing court is left in the dark as to why the ALJ chose to disbelieve the claimant.").

In the present case, Ali testified that she experienced nearly constant debilitating pain.  (R. at 159-60.)  This pain, according to Ali, prohibits her from holding objects as light as a glass of water and from standing for as short a time as it takes to drink a glass of water.  (R. at 162-63.)  Ali's son testified that she could not stand for longer than two minutes and testified that she does no housework, does not drive, does not take care of her children, and requires regular assistance to take a bath, get into bed, or get into a car.  (R. at 164-71.)  Ali's medical records

16

document past pain complaints as well.  At Ali's first visit to a doctor in the United States in

January 2002, Ali reported having constant mid to low back pain.  (R. at 99.)  Dr. Spina noted in

her objective comments that any movement appeared to cause Ali pain, including: getting onto

the exam table, laying down on the table, and sitting in a chair.  (Id.)  Dr. Spina diagnosed Ali

with back pain and gave her a prescription for pain medication.  (Id.)  In March 2002, Dr. Spina

noted that Ali was "in obvious pain with movement."  (R. at 108.)  In May 2002, Dr. Karim

reported that Ali had "painful range of motion" in her shoulder, tenderness in her back, and was

"in so much pain that she could not lift her leg on the table."  (R. at 136.)  Following a June 2002

examination, Dr. Bailly reported that Ali "does have bilateral knee pain."  (R. at 144.)  While

Ali's pain did improve with epidural shots, in July 2002 Dr. Karim noted following examination

of Ali, "Knee is better than before but the patient continues to have pain with poor range of

motion and tenderness at the lateral border of the patella."  (R. at 130.)  Finally, while the ALJ

made a point of noting that Dr. Karim indicated that Ali's lower back pain and right

patellofemoral syndrome was in remission as of Ali's July 24, 2002 examination (R. at 19), on

that day Dr. Karim also noted that Ali "continued to have severe pain, especially [in her] right

knee and left thigh region" (R. at 127 (emphasis added)).  Dr. Karim also gave her additional

injections to attempt to relieve her of her joint and knee pain and continued to prescribe Ali's

pain medications in equal or greater doses.  (R. at 128.)

     The ALJ dismissed Ali's subjective complaints because "some of claimant's problems"

were attributed by Dr. Karim to her obesity, "the objective clinical signs and findings" of

impairment were "minimal," her pain had improved with injections and medications, and

because "given the lack of significant objective clinical findings, one can reasonably assume she

has adopted a 'disabled' lifestyle when the record as a whole fails to establish that her

impairments render her so significantly limited." (R. at 18-19.)  The ALJ dismissed the

corroborating evidence of Ali's pain given by Ali's son because "given the significant number of

negative credibility factors pointed out above, the undersigned cannot assign significant weight

to these third party statements."  The ALJ did not set forth more specifically his reasons for

rejecting the testimony of Ali's son who testified that Ali's physical limitations were severe.  The

ALJ did note that "the testimony provided by claimant's son revealed that it is customary in his

native country of Somalia for mothers to retire in their 40s and for their families to care for

them."  (R. at 13.)

The Court finds that the ALJ erred when he neglected to explain <u>why</u> he found Plaintiff's

complaints of pain to be inconsistent with the other evidence.  <u>See</u> <u>Cline v. Sullivan</u>, 939 F.2d

560, 569 (8th Cir. 1991) (ALJ's decision is deficient and must be set aside where the ALJ does

not adequately explain the inconsistencies that caused the claimant's subjective complaints to be

rejected).  Plaintiff's <u>de minimis</u> level of physical activity appears to be consistent with her

complaints of pain.  <u>See</u> <u>Baumgarten v. Chater</u>, 75 F.3d 366, 369 (8th Cir. 1996) (noting that

"[t]o establish disability, [a claimant] need not prove that her pain precludes all productive

activity and confines her to life in front of the television").

The Court finds nothing in the evidence cited by the ALJ (or elsewhere in the record),

which clearly demonstrates, without the need for any further explanation, that Plaintiff must be

lying or exaggerating about her pain. [3]  If there are inconsistencies in the record that support the

---

[3] The Court assumes for purposes of this review that the ALJ did not base his decision on the
supposed cultural norms of Ali's native country because such a basis would be wholly
inappropriate on this record.  The ALJ solicited "yes" or "no" answers to questions based upon
cultural stereotypes of some Somali women from Ali's son.  (R. at 172-73.)  While Ali's son
answered these questions in the affirmative, there is no evidence that Ali's son is an expert on
Somali cultural practices concerning what happens when a Somali woman with a large family
reaches her forties.  And, in any case, relying on such testimony would be as improper as

CASE 0:04-cv-01436-DWF-SRN   Document 14   Filed 07/19/05   Page 19 of 21

ALJ's credibility determination, those inconsistencies are not self-evident.  This does not

necessarily mean, however, that the ALJ reached the wrong conclusion.  The ALJ may be able to

provide a logical and persuasive explanation for his credibility determination.  He may able to

point to specific and significant inconsistencies between Plaintiff's subjective complaints and

"the record as a whole."  He may be able to explain, for example, why he found that Ali could

stand for up to two hours in an eight-hour day and how this time period was determined (R. at

20) given that Ali testified that "stand[ing] is the worst" and that she "cannot even stand a little

bit" (R. at 162) and her son testified she could only stand for two minutes at a time (R. at 170).

The ALJ may also be able to explain how he determined that Ali could lift and carry ten and

twenty pounds frequently and occasionally, respectively (R. at 19), despite Ali's testimony that

she could not "carry anything" (R. at 160) and despite her son's testimony that he had not seen

Ali do any household work since the onset of her disability (R. at 170-71).  As another example,

the ALJ may be able to explain why he found that Ali could occasionally stoop, kneel, crouch,

and crawl when Ali and her son testified that she could not perform such activities due to pain.

(R. at 157-72.)

     For this reason, the ALJ's decision should not be reversed outright.  Instead, the matter

should be remanded, so that the ALJ can reconsider Plaintiff's credibility. [4]  See Baumgarten, 75

---

determining whether the pain allegations of a claimant born in a particular region of the United
States (North, South, Midwest, East, West, etc.) were credible based upon the social norms of the
applicable region.  The application of cultural or other stereotypes has no place in the
adjudication of Social Security—or any other—claims for relief authorized under the laws of the
United States.

[4] It should be left to the ALJ to decide whether any further evidentiary hearings would be helpful
in this matter.  If the ALJ believes that he can fully explain his reasons for not accepting
Plaintiff's subjective complaints of pain based on the existing record, then perhaps it will not be
necessary to conduct any new hearings, or to otherwise expand the record.  On the other hand,
the ALJ may find it easier to explain his evaluation of Plaintiff's credibility, explore further any

F.3d at 370 (remanding the case for further consideration of claimant's credibility where the ALJ's initial evaluation was deficient); Cline, 939 F.2d at 569 ("When the Secretary erroneously concludes that a claimant's allegations of pain are not credible . . . remand for further proceedings . . . is generally appropriate.").  If the ALJ still disbelieves Plaintiff's testimony regarding her pain, he will have to explain more fully just why it is that he finds her subjective complaints to be inconsistent with the record as a whole.

---

side effects of her pain medications as part of a Polaski review, or alter his evaluation if he elicits further evidence on which to base his decision.

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1.      Defendant's Motion for Summary Judgment (Docket No. 11) be **DENIED**;

2.      Plaintiff's Motion for Summary Judgment (Docket No. 8) be **GRANTED** as set

forth herein; and

3.      This matter be remanded to the Social Security Administration for further

proceedings to address the errors discussed herein.

Dated: July 19, 2005

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 5, 2005, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review of this decision.